# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 25, 2024         Decided July 19, 2024

No. 23-1248

COALITION FOR RENEWABLE NATURAL GAS,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS, ET
AL.,
INTERVENORS

———

On Petition for Review of a Final Action
of the Environmental Protection Agency

———

*Jonathan Y. Ellis* argued the cause for petitioner. With him on the briefs was *Sandra P. Franco*.

*Kimere J. Kimball* and *Alexander M. Purpuro*, Attorneys, U.S. Department of Justice, argued the causes for respondent. With them on the brief were *Todd Kim*, Assistant Attorney General, and *Lucas May*, Attorney, U.S. Environmental Protection Agency. *Joseph W. Crusham* and *John H. Martin*, Attorneys, U.S. Department of Justice, entered appearances.

Before: HENDERSON, MILLETT, and GARCIA, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: To ensure that America's transportation-fuel mix contains the statutorily required amounts of renewable fuel, EPA updated how it accounts for biogas-derived renewable fuel. Because its prior system was vulnerable to fraud and error, EPA implemented a more structured process that allocated reporting burdens among different fuel groups. An industry group petitioned this court to overturn EPA's changes. Because EPA's modifications are reasonable and supported by substantial evidence, we deny the petition for review.

**I**

**A**

Under the Clean Air Act's Renewable Fuel Program, EPA "shall promulgate regulations to ensure that * * * transportation fuel sold or introduced into commerce in the United States * * * contains at least the applicable volume of renewable fuel[.]" 42 U.S.C. § 7545(*o*)(2)(A)(i). Renewable fuel is produced from specific organic matter, known as qualifying "renewable biomass[,]" and is "used to replace or reduce the quantity of fossil fuel present in a transportation fuel." *Id.* § 7545(*o*)(1)(J). "[R]enewable biomass," in turn, is any matter that falls into one of seven specified categories such as "[a]nimal waste and material and animal byproducts[,]" [a]lgae[,]" and certain "[p]lanted trees and tree residue[.]" *Id.* § 7545(*o*)(1)(I). As such, "renewable fuel" encompasses a swath of products that include particular ethanols, biodiesels,

and compressed or liquified natural gases. 40 C.F.R. § 80.1426, Table 1.

Congress charged EPA with calculating annually the "applicable volume of renewable fuel" to be used in the Nation's transportation fuel. 42 U.S.C. § 7545(*o*)(2)(A)(i); *id.* § 7545(*o*)(2), (3). It also directed EPA to place "renewable fuel obligation[s]" on "refineries, blenders, and importers, as appropriate" to ensure those entities bring enough renewable fuel into the United States marketplace. *Id.* § 7545(*o*)(3)(B)(ii)(I); *American Fuel & Petrochemical Manufacturers v. EPA*, 937 F.3d 559, 570–571 (D.C. Cir. 2019) (per curiam).

Those covered parties demonstrate compliance with renewable fuel obligations through the EPA's credit-trading program. *See* 42 U.S.C. § 7545(*o*)(5); *American Fuel*, 937 F.3d at 571–572. That program's lifeblood is a credit called a "RIN." *Wynnewood Ref. Co., LLC v. EPA*, 77 F.4th 767, 774 (D.C. Cir. 2023). Parties generate RINs by producing or importing renewable fuel. *See American Fuel*, 937 F.3d at 571–572; 40 C.F.R. § 80.1426. RINs attach to the renewable fuel and can later be separated from the fuel—that is, they become an asset in the hands of their owner that can either be credited toward the owner's own renewable-fuel obligations or traded to other companies in need of renewable-fuel credits. *See* 40 C.F.R. §§ 80.1426, 80.1427, 80.1428, 80.1429; 42 U.S.C. § 7545(*o*)(5)(B); *Sinclair Wyo. Ref. Co. LLC v. EPA*, 101 F.4th 871, 879 (D.C. Cir. 2024).

This case involves biogas. Biogas comes from decomposing organic matter like sewage, food and crop waste, or manure. It can be used to produce transportation fuel once it has been collected, treated, and then liquified or compressed. When the decomposing organic matter that created the biogas

is a qualifying renewable biomass, EPA considers the biogas-derived transportation fuel to be renewable fuel. *See* 40 C.F.R. §§ 80.125(b)(3), 80.1426(a)(1)(ii).

Biogas is commonly converted into renewable fuel through a multi-step commercial distribution system. First, the biogas is extracted from its source waste at places like landfills or livestock operations. Second, the extracted biogas is treated to remove impurities and to increase its methane content. This treatment process transforms the biogas into renewable natural gas which is then injected into a commercial pipeline. Third, downstream parties extract the renewable natural gas and convert it to renewable fuel by liquifying or compressing it so that it can be used as transportation fuel.

Renewable natural gas producers generate RINs when the renewable natural gas is injected into the pipeline. *See* 40 C.F.R. § 80.125(b)(1). Those RINs can be separated (*i.e.*, turned into an asset distinct from the fuel) only by the party who withdraws the renewable natural gas from the pipeline, the party that compresses or liquifies it, or the party that uses or dispenses the compressed or liquified natural gas as transportation fuel. *Id.* § 80.125(d)(1).

**B**

Administering the RIN process for biogas-derived renewable fuel has proven difficult. *See* 88 Fed. Reg. 44468, 44524 (July 12, 2023). That is because the end-product fuel counts as renewable only if it is used for transportation fuel and the gas that produced it comes from the right source. *See* 42 U.S.C. § 7545(*o*)(1)(J). Yet it is hard to tell at the start of the chain where the biogas will end up, and it is just as hard to tell at the chain's end where the biogas began. *See* 88 Fed. Reg. at 44524–44526. EPA has to meticulously track each step of the

process to make sure that only valid RINs are generated and accepted. And parties have incentive to try to pass off non-renewable products as renewable since RINs have "significant value" in the transportation-fuel marketplace. *Id.* at 44525; J.A. 537 (EPA Response to Comments). The system also risked leaving parties confused or unable to verify whether the fuel they possessed was RIN-eligible, and so inadvertent mistakes could easily be made when generating RINs. 88 Fed. Reg. at 44524–44526.

As a result, in 2023, EPA revamped its approach to biogas-derived renewable fuel's commercial-distribution and RIN-generation track. To deter fraud and reduce the risk of error, EPA specified that "[o]nly [renewable-natural-gas] producers may generate RINs for [renewable natural gas] injected into a natural gas commercial pipeline system." 88 Fed. Reg. at 44567 (codified at 40 C.F.R. § 80.125(b)(1)). Renewable-natural-gas producers seeking to generate RINs for biogas-derived natural gas also have to obtain their biogas from biogas producers that have registered with EPA. 40 C.F.R. § 80.125(b)(2). EPA adopted new prerequisites for any biogas producer seeking to participate in the Renewable Fuel Program. *Id.* § 80.105. Among other things, they must register with EPA, submit reports, keep records, and follow a sampling, testing, and measuring regime. *Id.*

EPA also allowed biogas used as a biointermediate to generate RIN-eligible renewable fuel. *See, e.g.*, 40 C.F.R. § 80.100(d)(5). Biointermediates are "biomass feedstocks that are partially processed at one facility before being transported to a different facility to complete processing into renewable fuel." 88 Fed. Reg. at 44523. This change enabled a party to generate RINs using biogas that was only partially processed at one facility before its biointermediate was sent to another facility to be turned into renewable natural gas. *Id.* at 44523.

6

## II

The Coalition for Renewable Natural Gas is a trade association that represents companies and organizations that operate throughout the renewable-natural-gas chain. The Coalition submitted comments on EPA's updated rule arguing that it was too rigid and burdensome for the Coalition's members, and that EPA had no authority to regulate biogas producers. After EPA promulgated its final rule, the Coalition petitioned this court for review.

We have jurisdiction under 42 U.S.C. § 7607(b)(1). We review EPA's final rule to see if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Sierra Club v. EPA*, 863 F.3d 834, 837 (D.C. Cir. 2017) (quoting 5 U.S.C. § 706(2)(A)); 42 U.S.C. § 7607(d)(9)(A). We also must ensure that EPA acted within its statutorily assigned role and followed proper procedures in adopting the rule. 42 U.S.C. § 7607(d)(9)(C), (D). We will invalidate EPA's rules for a procedural error only if that error is properly before us, arbitrary, and "so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such error[] had not been made." *Id.* § 7607(d)(8); *id.* § 7606(d)(9)(D).

## III

The Coalition mounts nine substantive or procedural attacks against EPA's 2023 biogas regulation updates. We deny the petition because seven of those challenges are without merit, and the remaining two are not properly before us.

**A**

The Coalition first claims that EPA has no authority to regulate biogas producers. EPA relied on its Section 7545(*o*)(2)(A)(i) authority to include biogas producers in its regulatory scheme. That section specifies that EPA's renewable fuel regulations "shall contain compliance provisions applicable to *refineries, blenders, distributors, and importers*, as appropriate, to ensure that the requirements * * * are met." 42 U.S.C. § 7454(*o*)(2)(A)(iii)(I) (emphasis added). (For ease of reference, we shall refer to this statutory provision as the "shall-contain" mandate.) Because that list does not include producers, the Coalition insists that EPA cannot regulate them at all under Section 7545(*o*)(2)(A)(i).

The Coalition overreads the shall-contain mandate. By its plain text, that provision requires only that EPA regulations *include* rules governing those specified parties. It is a regulatory floor, not a cap. Nothing in the shall-contain mandate restricts what those regulations can otherwise do or to whom else they can apply. *Contrast* 42 U.S.C. § 7545 (*o*)(2)(A)(iii)(II) (requiring in the very next subparagraph that EPA's regulations "shall not" do certain things).

In other words, to say that EPA's regulations "shall contain compliance provisions applicable to refineries, blenders, distributors, and importers," 42 U.S.C. § 7454 (*o*)(2)(A)(iii)(I), is not to say that the regulations shall contain *only* those compliance provisions or that all its rules shall apply only to those enumerated parties. *See NLRB v. SW General, Inc.*, 580 U.S. 288, 300 (2017) (rejecting an interpretation that Congress "could easily have chosen clearer language" to convey). Instead, the shall-contain mandate's listed entities are simply "[a]mong the parameters Congress required EPA to

8

*include*" in its regulations. *Alon Ref. Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 654 (D.C. Cir. 2019) (emphasis added).

That reading of the shall-contain mandate fits naturally within the broader Section 7545(*o*) framework. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2379–2384 (2023) (Barrett, J., concurring).

Section 7545(*o*) gives EPA both a task and the means to accomplish it: "'[P]romulgate regulations' setting up a program to 'ensure that transportation fuel sold or introduced into commerce in the United States * * * contains at least the applicable volume[s] of renewable fuel[.]'" *Alon Ref. Krotz Springs*, 936 F.3d at 654 (ellipsis and second alteration in original) (quoting 42 U.S.C. § 7545(*o*)(2)(A)(i)). That task is nonnegotiable; EPA "shall" execute it. 42 U.S.C. § 7545(*o*)(2)(A)(i); *see Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) ("The first sign that the statute imposed an obligation is its mandatory language: 'shall.'"); *Heating, Air Conditioning, & Refrigeration Distrib. Int'l v. EPA*, 71 F.4th 59, 67 (D.C. Cir. 2023) (statute telling EPA to "ensure" something was ordering it to "guarantee that result").

To get the job done, EPA must be able to distinguish renewable from nonrenewable fuel. In this context, that means EPA must be able to verify that the biogas-derived fuel it is being asked to count as renewable was made with the correct biogas. *See* 42 U.S.C. § 7545(*o*)(1)(J); 88 Fed. Reg. at 44481. Without regulating biogas producers, EPA struggled to perform that verification, leaving it at risk of failing to "ensure" applicable volume targets were met. 42 U.S.C. § 7545(*o*)(2)(A)(i); *see supra* pages 4–5. The biogas-producer requirements are a natural and needed fix to that problem. Accordingly, contrary to the Coalition's suggestion that the

major questions doctrine applies, we have no "reason to hesitate" in this case, *West Virginia v. EPA*, 142 S. Ct. 2587, 2595 (2022) (quotation marks omitted), before concluding that Congress authorized the EPA's regulation of producers. After all, Congress expressly charged EPA with "promulgat[ing] regulations * * * to ensure that transportation fuel sold or introduced into commerce in the United States * * * contains the applicable volume of renewable fuel[.]" 42 U.S.C. § 7545(*o*)(2)(A)(i); *see Life Techs. Corp. v. Promega Corp.*, 580 U.S. 140, 149 (2017) (interpreting statute to "provide[] an administrable construction"). Verifying the sourcing of renewable fuel by its producers is essential to meeting Congress's mandate.

Anyhow, to the extent that the shall-include mandate limits EPA's regulatory authority at all, it is not in the way the Coalition suggests. At most, it could be argued that the entities listed in the shall-include mandate are the only ones for which EPA can require "compliance" with regulatory obligations. *See* 42 U.S.C. § 7545 (*o*)(2)(A)(iii)(I). That might make sense because the "shall include" group of "refineries, blenders, distributors, and importers" are necessarily involved in the renewable fuel process—and, more broadly, the transportation-fuel business—no matter that fuel's source. As a result, EPA will have to regulate those entities as part of the Renewable Fuel Program regardless of whether the renewable fuel is generated from "ethanol," "biomass-based diesel," "butanol or other alcohols," or some other source. 42 U.S.C. 7545(*o*)(1)(B)(ii).

By contrast, biogas *producers* do not have to participate in the renewable fuel scheme at all. Renewable fuel derived from biogas is just one permissible source from which EPA may meet its statutory mandate. Biogas could, instead, be excluded entirely.

In any event, the Coalition challenges only voluntary protocols, not compliance obligations. Under the updated regulations, biogas producers may elect to follow those rules if they wish to participate in the transportation-fuel economy and the RIN program. *See* 80 C.F.R. § 80.125(b). But, unlike the listed blenders, distributors, and importers, those producers could choose instead to use their biogas for non-renewable fuels or let it simply float off into the atmosphere.

So if those producers decide that they no longer want to record, measure, or report per the regulations, they are free to stop. EPA is not forcing them to comply with anything. All the regulations provide is that, if and when biogas producers independently decide that they want to enjoy the financial benefits of the RIN program, they must follow the anti-fraud, anti-error compliance measures that are part and parcel of the program.

As such, our decision is narrow. We hold only that EPA may use Section 7545(*o*)(2)(A)(i) to put in place processes to verify that its renewable-fuel targets are being met, and that—under the same provision—it may require biogas producers to follow those processes if they choose to participate in the RIN program.[1]

---

[1] To the extent that the Coalition broadly attacks EPA's authority to promulgate any specific biogas-producer requirements, *see* Coalition Opening Br. 31, 39, those challenges were not raised below, and so are not properly before us, *see* 42 U.S.C. § 7607(d)(7)(B).

**B**

The Coalition claims that three categories of the EPA's regulations are arbitrary and capricious: those related to biogas-producers, testing, and measurement. Not so.

**1**

The challenged regulations require those renewable-natural-gas producers that wish for their gas to become RIN-eligible fuel to test their gas, keep records of the results, and submit auditor attestations. 40 C.F.R. § 80.110(f)(2)(iii); *id.* § 80.145(c)(5), (6); *id.* § 80.165(a). Auditors must report if the gas does not meet its pipeline's "natural gas specifications[.]" *Id.* § 80.165(c)(4)(iii); *id.* § 80.135(d)(5). In addition, registered biogas producers who decide to participate in the Renewable Fuel Program "must only supply biogas for only one" of three specified uses, one of which is producing renewable natural gas via a commercial distribution system. *Id.* § 80.105(k)(1).

The Coalition argues that placing those registration, reporting, recordkeeping, and single-use requirements on participating biogas producers is arbitrary and capricious. According to the Coalition, "there is no actual *need* for these requirements," and so EPA's justification "is not sufficient to impose undue regulatory hurdles that may disincentivize those parties Congress sought to incentivize to support biofuel production." Coalition Opening Br. 37–38.

The Coalition is speaking in the wrong register. To pass muster, regulations need not be necessary. They need only be "reasonable and reasonably explained." *Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009). The challenged regulations were both. Before the regulatory

update, EPA often had to review a disorganized array of contracts to ensure that only validly earned RINs were generated. 88 Fed. Reg. at 44524–44525. Not only was that review difficult, it left the door open to fraud and accidental double counting, both of which contravene Congress's statutory directives. *Id.* at 44524–44526.

Renewable natural gas's nature amplifies those risks. Whether natural gas is renewable depends on whether its biogas came from a renewable biomass. *See* 42 U.S.C. § 7545(*o*)(1)(J). That can be hard to track. *See* 88 Fed. Reg. at 44524–44526. The higher value of biogas from renewable biomass—compared to that of biogas from nonrenewable biomass—also gives parties an incentive to claim falsely that an eligible biomass was used, thereby defrauding the program. 88 Fed. Reg. at 44525; *see also* J.A. 537 (EPA Response to Comments). And allowing parties to generate RINs from biogas-derived biointermediates made things worse because it introduced another stop, and another party, to monitor on the path from biogas to renewable fuel.

The EPA's regulatory updates aimed to disentangle those "layers of complexity" in a "system that is already challenging to implement and oversee." 88 Fed. Reg. at 44524. To deal with the heavy administrative burdens and the risks of fraud and mistake, EPA reasonably decided that biogas producers—who have first-hand knowledge of which biomass was used to generate their biogas—should bear some responsibility for demonstrating that their biogas is eligible to generate RINs. *See id.* at 44525–44526, 44532–44534, 44540–44541; J.A. 547, 581–583 (EPA Response to Comments). Likewise, requiring biogas producers to use their product in only one way helps to "minimiz[e] program complexity" and "eliminat[es] the opportunity for double counting in the first place." *Id.* at 44540; J.A. 581–583 (EPA Response to Comments).

The Coalition responds that EPA's regulations will push biogas producers out of the biofuel market. *See* Coalition Opening Br. 35. But the Clean Air Act does not pursue biofuel production at all costs. It establishes renewable-fuel targets and requires EPA to ensure the market meets them. *See* 42 U.S.C. § 7545(*o*)(2)(A)(i). These updated regulations directly and reasonably support that objective by reducing the risk that non-renewable fuel is counted toward the renewable-fuel target. If biogas producers choose to opt out of a more trustworthy renewable-transportation-fuel market, that is their choice.

As for the Coalition's suggestion that, because of these new regulations, too few biogas producers will opt into the scheme to meet EPA's renewable fuel targets, the Coalition offers nothing to substantiate that claim. *See, e.g.*, Coalition Opening Br. 4. Its silence is particularly indicting because EPA may rely on non-biogas-derived sources of renewable fuel to meet those targets. The EPA, for its part, considered these concerns and reasonably decided that the hypothetical risk of overburdening biogas producers was outweighed by the known risk of fraud and double counting that directly undermines the Renewable Fuel Program. *See* J.A. 539–540 (EPA Response to Comments).

**2**

The Coalition also claims that EPA failed to explain why it must "monitor compliance with pipeline specifications through costly and extensive testing" when commercial pipelines already monitor their own specifications. Coalition Opening Br. 43.

EPA actually does have an explanation: Its regulatory requirements are "necessary * * * since the definition of

[renewable natural gas] depends on the pipeline specifications." J.A. 555. Specifically, to be renewable natural gas, a product must "not require removal of additional components to be suitable for injection into the natural gas commercial pipeline system." 40 C.F.R. § 80.2. Knowing the commercial pipeline specifications, and knowing that the product meets them, helps EPA verify that the renewable natural gas "complies with the pipeline specification for RIN generation and to ensure cleaning of biogas is occur[r]ing[.]" J.A. 573 (EPA Response to Comments); J.A. 555 (EPA Response to Comments). It is, after all, EPA's statutory duty to ensure that the product injected into the transportation system is the type of renewable fuel Congress specified.

The Coalition does not like that explanation. It prefers that EPA just trust pipeline operators to run its checks for it. But it is not *arbitrary* for EPA to verify for itself that a product meets Congress's standards before it hands out valuable RINs. *See* J.A. 555 ("We believe it is imperative to show that the product of the [renewable-natural-gas] producer meets the requirements for [renewable natural gas]."). EPA "is not required to choose the best solution, only a reasonable one." *Petal Gas Storage, LLC v. FERC*, 496 F.3d 695, 703 (D.C. Cir. 2007).

**3**

Under the EPA's regulations, any party that is "required to measure the volume of biogas[ or renewable natural gas]" must use either an "[i]n-line GC meter compliant with" specified international standards and a "flow meter[]" compliant with other specified international standards, or an approved "alternative measurement protocol[.]" 40 C.F.R. § 80.155(a). The Coalition calls this requirement arbitrary because EPA did not explain why it adopted it. Coalition Opening Br. 44.

Yet EPA did explain its rationale, and reasonably so. EPA said that, given the commercial value of RINs, "parties have clear incentives to manipulate testing and measurement results to appear to have produced more biogas, [renewable natural gas], and biogas-derived renewable fuels than they actually did." 88 Fed. Reg. at 44534. So EPA adopted these "specific testing and measurement procedures" to "ensure the validity of RINs and a level playing field for RIN generators," rather than one undermined by fraud and error. *Id.* EPA relied on its technical expertise in choosing which procedures to select, a judgment well within its wheelhouse. *See id.* at 44535 ("These standards are based on methods used for these measurements which have been submitted to us in the past and which we believe provide sufficient accuracy.").

The Coalition layers on to its argument an objection to EPA's prohibition on generating RINs for any renewable natural gas stored off-site before EPA accepts the renewable-natural-gas producer's registration. *See* 40 C.F.R. § 80.1458; 88 Fed. Reg. at 44539–44540. The Coalition argues that if a renewable-natural-gas producer needs to use an alternative protocol to verify its biogas, it may face significant delays in getting registered, and so may encounter unreasonable on-site storage constraints.

EPA's choice was sensible. Allowing parties to generate RINs for renewable natural gas stored off-site posed significant oversight challenges. 88 Fed. Reg. at 44540. Due to the indeterminate and undisclosed period such renewable natural gas might be off-site, it had proved "difficult * * * to track discrete volumes * * * that [we]re claimed for RIN generation[.]" *Id.* The EPA's new rule reasonably addresses that quality-control concern by requiring that any renewable natural gas produced before registration complies with EPA's

renewable-fuel requirements and is kept in a facility that passes a third-party engineering review. *Id.* at 44539–44540; 40 C.F.R. § 80.1458.

As for concerns about registration delays, EPA explained that it had "greatly decrease[d] the time necessary to process registrations and thus eliminat[ed] the need for offsite storage[.]" 88 Fed. Reg. at 44539.

## C

In addition to those substantive challenges to the updated regulations, the Coalition launches several procedural challenges. None holds up.

## 1

To start, the Coalition argues that EPA's proposed rule violated the Clean Air Act's procedural requirements by giving "no explanation or factual support to connect numerous of the provisions to its claimed need for additional oversight to prevent double counting and fraud." Coalition Opening Br. 51–52.

The Clean Air Act, though, does not require EPA's proposed rule to provide a detailed explanation or factual record supporting each of its choices. As a procedural matter, the statute requires only that the proposed rule state its "basis and purpose," including a summary of the data, methodology, legal authority, and policy considerations on which the EPA relied. 42 U.S.C. § 7607(d)(3); *see Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 518–519 (D.C. Cir. 1983); *see also Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 548 (1978)

(forbidding courts from adding procedural requirements that are missing from the statutory text).

The regulations clear Section 7607(d)(3)'s bar. In its proposed rule, EPA discussed the considerations informing the rulemaking, laying out in particular its fraud and double-counting concerns. *See, e.g.*, 87 Fed. Reg. 80582, 80643–80644, 80694–80697 (Dec. 30, 2022). The EPA also found that "a not insignificant quantity of invalid RINs have been generated." *Id.* at 80643. In doing so, EPA detailed how and why RIN invalidity occurs, *id.*, why the earlier regulations fell short, *id.* at 80643–80644, 80692–80693, and how the updates would help, *id.* at 80644, 80692–80693, 80696–80697. To be sure, EPA did not provide much hard data on fraud— presumably because the prior regulations did not require the types of oversight or record-keeping that are necessary to reliably flush that problem out. While the Clean Air Act requires EPA to identify in a final rule any "factual data *on which the proposed rule is based*[,]" 42 U.S.C. § 7607(d)(3)(A) (emphasis added), it does not require EPA to provide data it did not use. Neither does Section 7067(d)(3)(A) procedurally require EPA to marshal the very factual information that the prior regulatory scheme made it impossible to collect. *See id.*; *Solite Corp. v. EPA*, 952 F.2d 473, 484 (D.C. Cir. 1991) (explaining that a similar requirement in the APA obligates it to reveal "technical studies and data" that is has actually "employed" in promulgating its rule) (quotation marks omitted).

**2**

The Coalition separately argues that the EPA added renewable fuel "[l]eakage" as a reason for RIN retirement in the proposed rule without proper explanation. Even if true, EPA's alleged error would be harmless because there is no

"substantial likelihood" that EPA would have "significantly changed" its final rule if it had explained "leakage's" addition earlier in the regulatory process. *See* 42 U.S.C. § 7607(d)(8); *id.* § 7606(d)(9)(D). EPA said in response to comments that it added "leakage" just to clarify the status quo under which losing fuel with an attached RIN invalidates that RIN because the lost fuel cannot be used for transportation. J.A. 545–546. Given that EPA considered and rejected objections to the provision, and explained that it was merely clarifying existing requirements, any failure to provide that rationale earlier was harmless. *See Small Refiner*, 705 F.2d at 523.

**3**

The Coalition additionally claims that three parts of the final rule were not logical outgrowths of the proposed rule. But the Coalition raised two of these arguments for the first time in a motion for reconsideration that is still pending before the EPA, and never raised the third at all before this petition. As a result, we may not entertain any of them at this time. *See* 42 U.S.C. § 7607(d)(7)(B) ("Only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment * * * may be raised during judicial review."); *EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 137 (D.C. Cir. 2015) ("Because that argument is an objection to the notice and comment process itself, petitioners obviously did not and could not have raised it during the period for public comment * * * [and so] the only appropriate path for petitioners to raise this issue is through an initial petition for reconsideration to EPA.").

**D**

Lastly, the Coalition argues that, "in light of the numerous issues and outstanding questions regarding the final rule and

the limited guidance from EPA," EPA's implementation dates for the new rules "have been rendered arbitrary." Coalition Opening Br. 57. Its brief, however, fails to raise any additional issues or outstanding questions beyond those considered and rejected here. EPA, for its part, reasonably selected its current implementation dates based on feedback from the comment period. *See* 88 Fed. Reg. at 44530. Indeed, for existing facilities, EPA chose the date *that the Coalition requested.* J.A. 403. There is nothing arbitrary about that.

\* \* \*

For the foregoing reasons, the Coalition's petition for review is denied.

*So ordered.*